THE CHICAGO & NORTHWESTERN RAILWAY CO.

v.

CATHARINE E. CLARK, Adm'x.

1. ACCIDENT FROM A PASSING ENGINE—INSTRUCTION AS TO CARE.—An instruction that if the deceased *at the time* he was killed was using reasonable care, etc., is erroneous. The language, as it stands, ignores the fact of any previous neglect on the part of the deceased, and according to the instruction, no matter what previous neglect there had been, if he were not negligent *at the time* of the collision, a recovery could be had.

Chicago & Northwestern Railway Co. v. Clark.

2. ESPECIAL CARE NOT REQUIRED TO GUARD AGAINST THE WILLFUL NEGLECT OF OTHERS.—The fact that the deceased was permitted by the company to unload freight at a dangerous place, and that the servants of the comp iny knew that the deceased was using a restive, skittish horse, afraid of the cars, does not impose upon them the exercise of especial care in the management of their engine to avoid any accident by frightening such horse. While to a certain extent the care and caution of a defendant should be greater to protect one incapable by reason of tender years, mental imbecility, or the like, from protecting himself, yet the willful neglect of a plaintiff fully able to protect himself, should not be urged as a reason why the care and caution of a defendant should be anything more than ordinary.

APPEAL from the Circuit Court of Whiteside county; the Hon. W. W. HEATON, Judge, presiding.

Mr. B. COOK, for appellant; that plaintiff cannot declare for negligence in running an engine, and recover for placing a car in an unsafe place to be unloaded, cited Cent. Mil. Tract R. R. v. Rockafellow, 17 Ill. 541; Mayer v. Humphrey, 1 C. &. P. 251; Moss v. Johnson, 22 Ill. 633; Sherman v. Blackman, 24 . Ill. 350; Cast v. Roff, 26 Ill. 452; Ill. Cent. R. R. Co. v. McKee, 43 Ill. 119; McKenney v. Neel, 1 McLean, 551; Angell on Carriers, § 592.

That declarations of the company's agent, made after the fact, are not admissible: 1 Greenleaf on Ev. § 113; Linblom v. Ramsey, 75 Ill. 246; M. C. R. R. Co. v. Carrow, 73 Ill. 348; M. C. R. R. Co. v. Gougar, 55 Ill. 503; C. & N. W. R'y Co. v. Fillmore, 57 Ill. 265; C. B. & Q. R. R. Co. v. Lee, 60 Ill. 501; C. B. & Q. R. R. Co. v. Riddle, 60 Ill. 534.

The care and caution of a plaintiff is not confined to the very time of the injury, but the question is also involved whether he was justified in being where he was at the time and under the circumstances: Ill. Cent. R. R. Co. v. Weldon, 52 Ill. 290; Keokuk Packet Co. v. Henny, 50 Ill. 264; Quinn v. Ill. Cent. R. R. Co. 51 Ill. 495.

As to the rule of damages in such cases: C. & N. W. R. R. Co. v. Jackson, 55 Ill. 497.

Instructions not based on evidence are erroneous: Ind. & St. L. R. R. Co. v. Miller, 71 Ill. 463; Andreas v. Ketcham, 77 Ill. 377; American v. Rimpert, 75 Ill. 228; Ill. Cent. R.

R. Co. v. Cragin, 71 Ill. 177; Ill. Cent. R. R. Co. v. Benton, 69 Ill. 174; Holden v. Hulburd, 61 Ill. 280; Paulin v. Hawser, 63 Ill. 312.

There must be negligence on the part of defendant, and no want of ordinary care on the part of the plaintiff, to warrant a recovery: C. B. & Q. R. R. Co. v. Van Patten, 64 Ill. 510; R. R. I. & St. L. R. R. Co. v. Coultas; 67 Ill. 398; C. B. & Q. R. R. Co. v. Lee, 68 Ill. 576.

The act of leaving horses unhitched, or driving skittish horses in close proximity to a locomotive, is negligence: Deville v. Southern P. R. R. Co. 50 Cal. 383; P. W. & B. R. R. Co. v. Stinger, 2 Cent. Law Jour. 555.

The verdict of the jury was found under improper instructions of the court, and hence should have no weight: T. W. & W. Ry. Co. v. Moore, 77 Ill. 917; Ill. Cent. R. R. Co. v. Hammer, 72 Ill. 347; Volk v. Roche, 70 Ill. 297.

Mr. F. SACKETT and Mr. W. H. BENNETT, for appellee; that a railroad company is liable for the negligence of its servants: cited G. & C. U. R. R. Co. v. Loomis, 13 Ill. 548; G. W. R. R. Co. v. Geddis, 33 Ill. 304.

Upon the question of comparative negligence: C. B. & Q. R. R. Co. v. Payne, 48 Ill. 499; C. B. & Q. R. R. Co. v. Triplett, 39 Ill. 482.

That deceased was not guilty of contributory negligence, in unloading cars at a point designated by the company: Newson. v. N. Y. Cent. R. R. Co. 29 N. Y. 383; Spooner v. Brooklyn City R. R. Co. 54 N. Y. 230; Ill. Cent. R. R. Co. v. Schultz, 64 Ill. 172; Ill. Cent. R. R. Co. v. Hoffman, 67 Ill. 286.

The degree of care to be exercised by railroad companies, depends upon the circumstances of the case: T. W. & W. R. R. Co. v. Miller, 76 Ill. 278; Schmidt v. C. & N. W. R'y Co. 83 Ill. 403.

Negligence is a question of fact to be determined by the jury: I. & St. L. R. R. Co. v. Stables, 62 Ill. 313; Nor. Line Packet Co. v. Binninger, 70 Ill. 571; Ill. Cent. R. R. Co. v. Cragin, 71 Ill. 177.

Where the evidence is contradictory, involving the credibility

Chicago & Northwestern Railway Co. v. Clark.

of witnesses, the verdict should not be disturbed except in a very clear case: Carey v. Henderson, 61 Ill. 378; Chicago City R'y Co. v. Young, 62 Ill. 238; Dietrich v. Rumsey, 45 Ill. 209; Davis v. Hoeppner, 44 Ill. 306; C. B. & Q. R. R. Co. v. Dickson, 63 Ill. 151.

As to the rule of damages: Ill. Cent. R. R. Co. v. Weldon, 52 Ill. 290; Tilley v. Hud. R. R. R. Co. 29 N. Y.

If substantial justice has been done, the verdict will not be disturbed. Dishon v. Schorr, 19 Ill. 59; Schwarz v. Schwarz, 26 Ill. 81; Rice v. Brown, 77 Ill. 549; Cuttingham v. Owen, 71 Ill. 397; Sterling Bridge Co. v. Baker, 75 Ill. 139.

LELAND, J. This was an action on the case for the damages consequent upon the death of a husband, sustained by his widow and next of kin, alleged to have been caused by the negligent management of a switch engine of the appellant, at a station. At Sterling there were many railroad tracks, the general course of which, at the place of the injury, was east and west, converging, of course, at the east and west ends of the depot grounds into the track, as it is between stations. Among these tracks, there were four substantially parallel, at and near the place of collision. The northern one was called the house track; the next one south, and fourteen feet eight inches therefrom, was named the Morrison track; the next, thirty-one feet south from the Morrison, was called the main track, and the other was a more southern one, and a safer place for loading and unloading cars, and on which cars were often placed for that purpose.

The deceased was loading wheat from cars on the house track into a two-horse wagon, to be hauled to a mill south of all the tracks, and less than a quarter of a mile from the place of loading. It appears, without conflict, that the deceased preferred this place of loading, as more convenient than the one at the southernmost of the four tracks, mainly because the neighborhood of the last named place was more muddy. It also appears that appellant, to some extent, tolerated this preference of the deceased, and allowed him and others to load their wagons out of cars at the house track opposite the freight house, which was close to it on the north of it.

Deceased was a vigorous man, and evidently not a timid one —one who prided himself upon his skill in the management of a team of horses. He considered the danger of loading at the house track as of little moment, and was perfectly willing to exchange the greater safety and more inconvenience of the southern track, for the greater convenience and less safety, if any in his estimation, of the house track, and frequently did so.

After having said thus much about the two southernmost tracks, we may dismiss them as of no further use in this opinion, and confine ourselves to the two northernmost ones. There were three freight cars on the house track, immediately south of the freight house. Deceased had hauled six loads to the mill, and he was about loading the seventh and last, out of the center car. He was just upon the point of driving his team up alongside of the center car. The switch engine was coming on the Morrison track, headed east. The horses on the wagon were headed nearly west. The off-horse, the one nearest the freight car, was not a safe one, and deceased knew it; the near horse, a black, was. The off-horse had run away, and was afraid of an engine and cars, and deceased had frequently been told he was unsafe. He was the successor of a safe mate of the black. As the engine came towards the place of collision, its speed was slackened, and its motion must have been quite slow —nearly stopped when the collision took place. We do not perceive in what respect the engineer and fireman managed the engine improperly. It is a little difficult to describe exactly how the wagon and engine came in contact; but about one thing there seems to be no conflict, and that is, that the southernmost hind wheel of the wagon and the cylinder on the north side of the engine came together, so as to dent or bruise the brass of the cylinder, and that the position of the wagon at the time of contact was longitudinally nearly northwest and southeast; and it is also almost conclusively shown that the wagon was backing instantly before the contact. If while the backing was in progress, the wagon tongue and reach formed one right line, the hind wheel would make a right line track. If the end of the wagon tongue was south of the line of the reach, the

track of the hind wheel would be curved with the convex side to the north.    If the end of the tongue was to the north of the line of the reach, the track would be also curved, but with convexity towards the south.

For all practical purposes, if there were backing southeastwardly so that the south hind wagon wheel came in contact with the north cylinder, we may take the above case of a right line track of the hind wheel, we would then have the wagon moving southeasterly, the engine slowly easterly, and contact as above.    What is the effect upon a man standing in the wagon, where men usually stand while driving?    The momentum of the wagon is destroyed by the contact.    The momentum of the center of gravity of the man continues, throwing it outside of the base southeasterly.    The south side-board of the wagon prevents the man from saving himself, and he plunges diagonally southeastwardly over the side-board.    If the contact of the locomotive, moving eastwardly, should slide the wagon laterally northward, the base of the man would move northwardly faster than the center of gravity, and the fall would be aided and made more southward.    The man, thus falling, so fell that an engine-wheel passed over his arm. There was amputation, and he died in two days.    Probably the headlong fall, rather than the crushing of the arm and amputation thereof caused the death.    That it would not have happened if the predecessor of the unsafe off-horse hand been by the side of the safe near horse, no one can doubt.    He would have been safe enough as it was if he had got out in time, and stood at the head of the horses, or if he had called upon those who were helping him load, to take them by the bits, but he was evidently a man who did not like to ask any one to help him manage a pair of horses.    He could attend to that himself.

We are not disposed to attach much importance to the admitted evidence, as to what Gault said to Wilcox.    It was a mere repetition of that which had frequently occurred before on allowing deceased to have his preference as to the place of loading, with the same caution, frequently given before, *i. e.*, "the house track is not as proper as the southernmost one, but

if you prefer it with its greater danger, we will tolerate it, once more if you will be speedy about your work." We do not suppose that deceased, or appellant contemplated that the business of switching was to be suspended, while the deceased was at work, but that it was to continue as it had before, when the engine had, on repeated occasions, passed and repassed about its work while deceased was about his. We do not understand it to be the declaration of agents about past transactions, but in the nature of unenforced advice given by a superior to an inferior. Although the case seems to us to be one where there is much evidence tending to show negligence on the part of the deceased, and much tending to show that the engine was prudently and properly managed, while passing the wagon and horses, and that the motion of the engine had almost entirely ceased at the time of contact, that deceased was not borne along by it; that it did not pass on and leave him, but that he was taken up from the side of the engine, at the place where he fell; still as two juries have found against the defendant, (70 Ill. 276), we do not feel justified in reversing merely because the verdict is against the evidence.

We, therefore, pass to the consideration of the question whether there was any erroneous ruling.

We have already, incidentally, said all we desire to about the Gault and Perry conversation.

As we have concluded to reverse, for reasons hereafter mentioned, it is perhaps unnecessary to say anything about the variance between the proof and allegations other than to suggest to appellee, whether it would not be prudent to amend the declaration by inserting therein an allegation that appellant negligently suffered and permitted deceased to load and unload in dangerous proximity to the Morrison track, etc., so that we will not have that question here the next time the case comes up, if ever.

Plaintiff's first given instruction is defective in this, to-wit: It states that if the said Horace Clark was, *at the time* he was killed, using reasonable care and caution to avoid being injured, and defendant was negligent, etc., the jury must find defendant guilty. If, instead of the words *"was at the time using,"*

the simple word "*used*" had been adopted, the instruction would have been accurate. The language, as it stands, renders it unnecessary for deceased to have avoided taking an unsafe horse there, to have hitched the off-horse to the freight car, to have driven him westwardly and northerly around the west end of the freight house, or to to have called for his fellow-workmen to take the horses by the bits, or to have done so himself, though such conduct would have made it absolutely safe for deceased. No matter what previous neglect there had been, if he were not negligent *at the time* of the collision, he could recover, according to this instruction. See Ill. Cent. R. R. Co. v. Weldon, 52 Ill. 290 ; Deville v. Southern P. R. R. Co. 50 Cal. 383; Quinn, adm'x v. I. C. R. R. Co. 51 Ill. 495; C. B. & Q. R. R. Co. v. Daniel, 81 Ill. 450; P. W. & B. R. Co. v. Stinger, 2 Cent. Law Journal, 555.

The third instruction given for plaintiff, is as follows.   It is somewhat novel:

3.   " If the jury believe, from the evidence, that at the time the accident in question occurred, the said Horace Clark was engaged in unloading freight from a freight car of the company at a place upon the company's depot grounds, where he had been directed or permitted by the company so to do, and that in unloading said freight, said Clark was using a horse, restive or skittish when in the vicinity of moving cars or engines; and if they further believe from the evidence, that the said character of said horse was then well known to the agents of the company running the engine which inflicted the injury in question; if the jury believe, from the evidence that such injury was inflicted by said engine, then it was the duty of said agents to be especially careful in operating said engine in the immediate vicinity of said horse, and to use all reasonable and proper care to avoid causing any accident by frightening said horse."

The deceased had been warned about his skittish off-horse, and told that he was dangerous in the neighborhood of locomotives.

Is it possible that railroading must stop, or be conducted with especial care and caution every time an unwelcome and

annoying animal is brought into the neighborhood of the appellant's engine, against the oft repeated intimations of appellant's servants that the driver should keep him away?

Would it not have been a proper answer to a request to "stop switching, because you will scare my horse," to say "the law does not allow you to bring your unsafe horse into such dangerous places? We cannot stop our trains, or our switch engines. We have told you that we did not want him here." The instruction is not based upon the fact, that the company had allowed and permitted the use of the restive or skittish horse, but simply on the ground that deceased had been directed or permitted to unload freight at the place where he was unloading it. The instruction as applied to the evidence, is, that although you are using the unwelcome horse at the permitted place of unloading, the engineer and fireman must take especial care not to frighten this animal, improperly there.

It may be, that to a certain extent the care and caution of a defendant should increase as that of a plaintiff diminishes; or rather that the defendant should be more careful to protect one incapable of self-protection by reason of drunkenness, mental imbecility, tender years, or the like, but we do not think that the willful neglect of a plaintiff fully able to protect himself, should be urged as a reason why he should recover, or that the care and caution of the defendant should be anything more than ordinary, because of the carelessness of the plaintiff being so great. The words "especial care" have no fixed legal signification, and with prejudiced jurors, if there should be such, might mean what they desired to have them. This instruction also excludes the consideration, that although the horse was restive or skittish, the engineer and fireman may have believed that under the control of the deceased there was no danger, as they had passed the team safely so many times before with the engine. It should, at least, have had added to it, "and that if, because of such restiveness or skittishness the engineer and fireman had reason to apprehend danger, they should have taken more than ordinary care, i. e., especial care. It would have been proper to have said that what amounts to ordinary care depends upon all the circumstances in evidence in this case. But the

rule should always be ordinary care, under the circumstances in evidence, though what would be ordinary care in one case might not be in another condition of the facts.

Exception is also taken to the plaintiff's fifth instruction, allowing as an element of damage the loss of the physical, moral and intellectual training which the children would have received from their father if he had lived, because there is no evidence on which to base it. Counsel have overlooked the evidence of McKinney, with whom the widow was raised from a child. He says, "I think his moral character and conduct towards his family, in reference to their moral education and instruction was good." The instruction is a substantial copy of the one on p. 294 of the 52 Ill.

We are inclined to think that there was nothing in the defendant's fifteenth, seventeenth and eighteenth refused instructions, which could not, if the jury was not pressed for time, have been discovered in the eighteen given instructions, by the exercise of reasonable research.

For the reasons aforesaid, we think another jury should pass upon the case, and therefore, the judgment is reversed and the cause remanded.                         Reversed and remanded.